# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

RICHARD WERSHE, JR,

*Plaintiff,*

Case No.  21-CV-11686

*v.*

Hon.  Laurie J. Michelson

THE CITY OF DETROIT; WILLIAM
JASPER, former Detroit Police
Officer, individually; KEVIN
GREENE, former Detroit Police
Officer, individually; CAROL DIXON
as representative of the estate of
JAMES DIXON, former Federal
Bureau of Investigations agent,
individually; HERMAN GROMAN,
former Federal Bureau of
Investigations agent, individually;
LYNN HELLAND, former Assistant
United States Attorney; and E. JAMES
KING former Assistant United States
Attorney; and UNKNOWN
ASSISTANT UNITED STATES
ATTORNEY; jointly and severally,

**FIRST AMENDED VERIFIED
COMPLAINT AND JURY
DEMAND**

*Defendants*

AYAD LAW, PLLC
Nabih H. Ayad (P59518)
William D. Savage (P82146)
Attorney for Plaintiff
645 Griswold St., Ste 2202
Detroit, MI 48226
P: 313.983.4600
F: 313.983.4665
ayadlaw@hotmail.com

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

A Y A D   L A W ,   P . L . L . C .
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

## FIRST AMENDED VERIFIED COMPLAINT

NOW COMES, Plaintiff Richard Wershe, Jr (hereinafter "Plaintiff"), by and through his attorneys at Ayad Law, PLLC, and does hereby make the following complaint:

## PRELIMINARY STATEMENT

It is anticipated that Defendants in this action will assert a defense based on the statutory limitations periods of Plaintiff's causes of action. However, the undersigned counsel has done extensive research as to that issue, and feels confident in bringing this action based on the relatively recent (and commendable) trend of federal courts to apply equitable tolling of limitation periods in cases brought by recently released prisoners against the criminal justice system and those that had the power to keep them imprisoned. "Thus, the Court concludes that in the prison context, reasonable fear of retaliation may be sufficient to constitute extraordinary circumstances warranting equitable tolling, particularly if the person threatening retaliation is a defendant or another official who could be or was influenced by a defendant." *Davis v Jackson*, No. 15-CV-5359 (KMK), 2016 WL 5720811, at *11 (SDNY, September 30, 2016).

The emerging doctrine holds that when a prisoner has a legitimate fear of retaliation for exercising their rights, equitable tolling must be considered. Here, Plaintiff Wershe actually has been retaliated against by the justice system, and

received wise counsel from his prior two attorneys (William Bufalino and Ralph Musilli) to forego seeking legal redress until he was out of prison for fear of retaliation.[1]

### THE PARTIES

1. Plaintiff RICHARD J. WERSHE, Jr. is a recently released prisoner. Plaintiff is also known by the pseudonym White Boy Rick, a name given to him by the news media and never used by himself or his acquaintances. Born July 18, 1969, Plaintiff spent 32 years and 7 months in prison, only being released last year on July 20 of 2020. Plaintiff is the longest serving sentence bestowed on a minor, for a nonviolent offense, in the history of the State of Michigan, 32 years and 7 months; His entire adult life until his release less than a year ago. Prior to his arrest in 1987, and as of now in 2021, Plaintiff resides in Eastern District of Michigan.

2. Defendant THE CITY OF DETROIT is the municipality which operated the Detroit Police Department and employed the individual police officers that participated in the Joint Federal Bureau of Investigations-Detroit Police Department Task Force which abused Plaintiff as a minor.

---

[1] See attached Affidavits of Richard J. Wershe, Jr., his fiancée Michelle MacDonald, and his former attorneys widow Ms. Lynn Hoover.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

3. Defendant WILLIAM JASPER, is a former Detroit Police Officer. Upon information and belief, he lives in Eastern District of Michigan.  He is being sued in his individual capacity.

4. Defendant KEVIN GREENE, is a former Detroit Police Officer. Upon information and belief, he lives in Eastern District of Michigan.  He is being sued in his individual capacity.

5. Defendant CAROL DIXON is sued in her capacity as representative of the estate of JAMES DIXON. James Dixon is a former Federal Bureau of Investigations agent. Upon information and belief, he lived and passed in Eastern District of Michigan; his wife, Carol Dixon, currently lives in the Eastern District of Michigan; and his estate is in the Eastern District of Michigan. He is being sued in his individual capacity.

6. Defendant HERMAN GROMAN, is a former Federal Bureau of Investigations agent. Upon information and belief, he lives in Eastern District of Michigan. He is being sued in his individual capacity.

7. Defendant LYNN HELLAND is a former Assistant United States Attorney for the Eastern District of Michigan and was the head of the public corruption unit at the United States Attorneys Office for the Eastern District of Michigan. He worked closely with Defendant Herman Groman on Operation Backbone. Upon information and belief, he lives in Eastern District of Michigan. He is being sued in his individual capacity.

8. Defendant EDWARD JAMES KING is a former Assistant United States Attorney for the Eastern District of Michigan. He was a lead attorney working with the Drug Enforcement Agency in the 1990's to convict Detroit gang members. Upon information and belief, he lives in Eastern District of Michigan. He is being sued in his individual capacity.

9. Defendant UNKNOWN ASSISTANT UNITED STATES ATTORNEY is a former Assistant United States Attorney for the Eastern District of Michigan. He is whoever Lynn Helland referred to when he told Plaintiff in 2003 that his 'boss' had unsealed Plaintiff's grand jury testimony would not allow any Assistant United States Attorney to advocate for Plaintiff's release from prison. Upon information and belief, he lives in Wayne County, Michigan. He is being sued in his individual capacity.

## JURISDICTION & VENUE

10. Under U.S. Const. Art. III §2, this Court has jurisdiction because the rights sought to be protected herein are secured by the United States Constitution. Jurisdiction is proper pursuant to 28 U.S.C. § 1331, *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), *et seq.*, 5 USC § 702, 5 USC § 706, the United States Constitution, and federal common law.

11. This action seeks declaratory relief pursuant to the Declaratory Judgement Act, 28 USC §§ 2201-2, Rules 57 and 65 of the Federal Rules of Civil

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

Procedure, and pursuant to the general, legal, and equitable powers of this Court.

12. This action seeks damages pursuant to 28 USC § 1343(a)(4) and 28 USC § 1357.

13. Venue is proper under 28 USC § 1391(e) because the Defendants in this action are United States officers or employees and a substantial part of the events giving rise to the claims herein occurred in this judicial district for the Eastern District of Michigan.

## FACTUAL BACKGROUND

### *CHAPTER ONE: CHILD ABUSE*

14. In 1980's Plaintiff sister started dating a known drug dealer. Plaintiff's father became concerned and contacted the FBI to ask if they could help get this drug dealer out of her life.

15. In 1984, FBI Agent James (Jim) Dixon (the estate of which is sued here as represented by surviving spouse Carol Dixon, hereinafter all referenced collectively as "Dixon") met with Plaintiff's father at a McDonalds, where he had taken Plaintiff. Dixon agreed to help Plaintiff's father on the condition that Plaintiff's father identify individuals in photographs which Dixon had brought with him.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

16. There, Plaintiff was able to identify most of the individuals in the photographs because, like nearly all of his classmates and neighborhood friends, he knew the individuals from neighborhood gossip.

17. Dixon was apparently impressed with Plaintiff's knowledge, because within a few days, he drove up alongside Plaintiff as he walked home from school and told Plaintiff to "get in" to his vehicle.

18. Plaintiff, being a 14-year-old child with the fear of law enforcement common to East Detroiter's at that time, felt compelled to do as he was told by this law enforcement agent, a figurative and literal authority figure.

19. Although he did not want to out of fear, Plaintiff complied with Dixon's demands

20. Mr. Dixon's unannounced visits with Plaintiff quickly became a regular occurrence, occurring dozens of times over the course of the next several months, with Dixon introducing Plaintiff to other law enforcement from both the Federal Bureau of Investigations ("FBI") and the Detroit Police Department ("DPD") that were part of a joint taskforce (the "taskforce").

21. At no point during his time working as a confidential informant did Plaintiff feel he was free to disobey the taskforce officers when they demanded he get into their vehicles.

22. Although the taskforce agents and officers made absolutely clear to Plaintiff that he was not to speak of their dealings to anyone, in order to attempt to

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

cover their abuse, they would occasionally give Plaintiff some cash to keep from talking.

23. Knowing how fundamentally wrong and outrageous it was to endanger a child, Dixon and the taskforce hid this fact in their official files by using Plaintiff's father's name, Richard J. Wershe, Sr., in their reporting, instead of Plaintiff's name: Richard J. Wershe, Jr.

24. In approximately August of 1984, Dixon introduced Plaintiff to his coworker, FBI Agent Herman (Herm) Groman ("Groman").

25. Dixon then stopped interacting with Plaintiff while Groman began accosting Plaintiff much more frequently than Dixon had, multiple times a week and sometimes each day for several days in a row.

26. Like Dixon, Groman would randomly accost Plaintiff while he walked to or from school, to the store, to friends' houses, to or from the basketball court, or even show up at Plaintiff's home unannounced.

27. **Unlike Dixon, Groman asked for Plaintiff to act as more than just an informant and began having Plaintiff engage in extremely more dangerous criminal drug-related activity.**

28. Thereupon, Groman introduced Plaintiff to DPD officers William (Billy) Jasper ("Jasper"), Kevin Greene ("Greene") who were part of the task force.

A Y A D   L A W ,   P . L . L . C .
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

A Y A D   L A W ,   P . L . L . C .
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

29. Although Plaintiff was hesitant to keep cooperating, Groman and the task force pressured Plaintiff to continue down this dangerous path, thereby risking his life.

30. Plaintiff, at the tender age of 15 years, was of a malleable and impressionable mindset and did what the FBI agent and DPD officers demanded he do, that is go into drug houses he did not know, in areas of the city he did not know, and ask to buy drugs from people he did not know, because Groman, Jasper, Greene and other law enforcement officers assured him that they "would be right there" if anything went wrong.

31. **At the time, being a child, Plaintiff did not fully comprehend that, despite their supposed best intentions, the task force would be completely unable to save him should one of the many violent drug dealers or their criminal henchmen decide to shoot Plaintiff for nosing in on their drug operation**.

32. **In the months of August, September, October, and November of 1984, Groman, Jasper, and/or Greene would pick Plaintiff up in his car and make him go purchase drugs from drug houses throughout the greater Detroit area, return with the drugs, allow them to take a small sampling of the drugs, and then leave with the remainder of the drugs, with instructions to sell them**.

33. Plaintiff, although clearly an adolescent with little business sense, thanks to the task force, was frequently in the same place, at the same time as Johnny

Curry, the leader of a dangerous drug-trafficking gang known as the Curry Gang or the Curry Brothers Gang.

34. It is no surprise that then that Plaintiff likely raised suspicion amongst these dangerous criminals, who likely suspected him to be an informant.

35. In November of 1984, there was an attempted assignation of Plaintiff whereby he was shot at point blank range with a .357 magnum, cutting his large intestine in half and, and only surviving by the grace of God.

36. **Grosman, Jasper, and Greene went to see Plaintiff in the hospital for the sole purpose of persuading and coercing him into lying about the circumstances of his attempted assassination**.

37. **Instead of pulling him out, they further endangered him by coercing him to stay a confidential informant.**

38. After being shot, Plaintiff did as he was told by Groman, Jasper, and Greene and lied about his attempted murder, stating that it was all just a big "accident."

39. Yet, it was obvious to most that the shooting was not an accident, Plaintiff was told to cover it up to greatly increase his credibility on the 'streets' and, more importantly to the Defendants that it would allow them to continue their abuse of Plaintiff.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

40. Not only did Defendants continue their abuse, but Plaintiff ended up doing for more 'jobs' for the task force after he was shot than he ever did before he was shot.

41. In fact, Defendants gave 15-year-old Plaintiff a fake ID stating that he was 21 and sent him to Las Vegas with thousands of dollars of cash, to go undercover.

42. When Plaintiff was first criminally charged, he gained notoriety in the local news and been dubbed by the media as "White Boy Rick."

43. The media dubbed Plaintiff a drug "king pin," and accusation that was false in every sense.

44. Plaintiff had no employees, agents, or underlings, and no criminals had allegiance to Plaintiff, at any time.

45. Plaintiff was young and completely unable to comprehend in an adult sense the dangers of being a 'rising star' in the drug trade in a highly contested drug-war battleground of 1980's Detroit.

46. Plaintiff's fame and notoriety made him a local legend amongst his peers, but amongst adults as well.

47. In 1987, when the media coverage of "White Boy Rick" exploded, Plaintiff became a local and national celebrity, easily recognized and often followed and photographed by Detroit news reporters.

48. By this time, Grosman, Jasper, Greene, and the other members of the task force had ended their contacts with Plaintiff, likely to save themselves from

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

legal action should they have been caught using a 14/15-year old as a drug dealer-informant.

49. Plaintiff was now a 16-year-old child, known on sight by most of Detroit as a notorious drug king pin, in a city being ravaged by drug warfare, both between rival drug gangs and the Detroit Police Department, and with no trusted adults that he could contact for any guidance.[2]

50. Accordingly, criminals attempted to murder Plaintiff on multiple occasions.

51. On one occasion, a drive-by shooting occurred at Plaintiff's father's house while Plaintiff's jeep was parked outside. His father's house was shot, 15 to 20 bullets struck his jeep, and at least one bullet flew within a foot of Plaintiff's father's head while he sat and watched television in his family room.

52. On another occasion, Plaintiff was the passenger of a car in which he was driving with his friend, Roy (last name unknown), and a van pulled up alongside them while they were stopped at a light at Harper Avenue and Outer Drive, when the van's door swung open and an occupant opened fire on Plaintiff.

53. Plaintiff's friend ran the red light, sped through the intersection, and the pair escaped uninjured.

---

[2] The task force that Plaintiff had worked with focused on two types of criminals, Curry Gang members and corrupt Detroit Police Officers. Accordingly, Plaintiff was afraid of ever having to call on the Detroit Police Department (outside of the task force) for help.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

54. But hitmen should not have been Plaintiff's only concern. Now that he was falsely promoted as a drug king pin in a city which was clamoring for law enforcement to punch back at the drug traffickers, Plaintiff was also an irresistible target for Detroit Police Officers, whom potentially knew nothing of Plaintiff's past career as an informant with a specialized federal-local joint "task force." **Thanks to Defendants, Plaintiff had become a target for the drug gangs as well as a target for law enforcement**.

55. Accordingly, on May 22, 1987, at the age of 17, upon information and belief, Plaintiff was set up and taken down by Detroit Police.

56. While driving to his grandmother's house with a friend (where Plaintiff often parked his car), Plaintiff and his friend were pulled over by Detroit Police.

57. There, although Plaintiff allowed the DPD officers to search his vehicle, a conflict ensued as the DPD officers became aggressive with Plaintiff and his friend.

58. Frightened, Plaintiff did as any child would do, and ran away.

59. When DPD caught Plaintiff less than an hour later, they beat him so badly, including whipping him with their pistols, that he had to be hospitalized at Detroit Receiving Hospital overnight.

60. Hours after Plaintiff's hospitalization at the hands of DPD, DPD allegedly received a 911 call tipping them off to a large box full of cocaine that was

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

later used as evidence against Plaintiff in the case that put him in prison for 32 years 7 months.

61. **This was despite the fact that none of the many witnesses who witnessed Plaintiff flee that day saw Plaintiff running with a box, despite trying the DPD forensic technicians could recover no fingerprints from the box, and when the 911 tape was requested DPD stated that the 911 call had happened right as the tape was being changed, so they claimed there was not tape recording to give**.

62. In 1978, Michigan passed what became known as the 650-lifer law (MCL 333.7401) which, before its revision, **mandated that anyone convicted of possessing 650 grams of cocaine or more be sentenced to life without the possibility of parole**.[3]

63. At his trial, Plaintiff was alleged to have possessed more than 650 grams of cocaine with an intent to distribute it.

64. **In 1987, while still a minor, Plaintiff was convicted and sentenced to life without parole**.[4]

---

[3] After Plaintiff's sentencing, Reforms to the 650-lifer law in Michigan drug crime cases now have changed the mandatory life sentence requirement to 20 years to life, **with eligibility for parole**.

[4] This sentence, as applied to Plaintiff, was later held unconstitutional by the Supreme Court of the United States: "1) Eighth Amendment prohibits imposition of life without parole sentence on juvenile offender who did not commit homicide, and 2) State must give juvenile nonhomicide offender sentenced to life without parole meaningful opportunity to obtain release." *Graham v Florida*, 560 US 48; 130 S Ct 2011; 176 L Ed 2d 825 (2010), as mod (July 6, 2010).

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

### CHAPTER TWO: DEFENDANTS' CONTINUED UNLAWFUL ACTION

65. In 1991, while Plaintiff was in prison, Defendant Groman introduced Defendant Lynn Helland ("Helland") an Assistant United States Attorney with the Eastern District of Michigan.

66. Both Groman and Helland wanted Plaintiff to play a key role in a large sting-operation to take down corrupt Detroit Police and politicians, among others. This was deemed "Operation Backbone."

67. Although Plaintiff initially did not want to participate, Helland persisted and persuaded the then 20-year-old Plaintiff that if he helped them, **they would always do everything in their power to get Plaintiff released from prison**.

68. Operation Backbone was a success, with some 13 Detroit Police and public officials being arrested as a result of the operation.

69. Helland then, arranged to have Plaintiff placed in the witness protection program while in prison, out of fear that elements of the corrupt Detroit Police Department that he had helped to strike a blow, would be able to retaliate against him while he was imprisoned.

70. This relocation and giving of a fake identity had a massive psychological effect, (essentially cutting Plaintiff off from his family to the point that he did not see his father for 15 years and saw his mother only twice in as many years) on Plaintiff as the thought that the same law enforcement that he had looked up to as a child, and worked with, just a few years ago, would potentially have

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

him killed while he was in prison, drove home for Plaintiff the absolute dehumanizing vulnerability that accompanied being locked up; his existence was not just jeopardized by prison gangs, but by the entire *justice* apparatus itself.

71. **Now, after having to be relocated into the witness protection program, Plaintiff's attorney William Bufalino's advice to not attempt legal action against any of the law enforcement that had caused his imprisonment made sense in an entirely more serious way.**

72. **Plaintiff was terrified of his captors. And the hopelessness inevitably instilled by his sentence of life without parole sapped the 'fight' out of him the entire time he was incarcerated**.

73. In approximately 1992, federal agents from the Drug Enforcement Agency ("DEA") along with Assistant United States Attorneys ("AUSA") from the Eastern District of Michigan E. James King ("King") approached Plaintiff for more life-risking help and asked him to testify before a grand jury against members of the Best Friends gang.

74. Once again fearing for his safety, Plaintiff at first refused.

75. Yet King assured Plaintiff that he had nothing to worry about because he guaranteed the indictments of these criminals and Plaintiff's testimony before the grand jury would always be sealed and never be released, specifically to protect those testifying against the gangsters.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

76. This guarantee from the Assistant United States Attorney assuaged Plaintiff's fears and he agreed, on the condition that King do everything in his power going forward to assist Plaintiff in getting his sentence commuted.

77. **King agreed to do everything in his power to get Plaintiff's sentence commuted in exchange for his grand jury testimony against the very dangerous and deadly 'Best Friends' gang.**

78. **The parties having reached an agreement, sometime between 1992 and 1993, Plaintiff testified before the grand jury regarding the Detroit gangsters and drug pushers as requested, giving very powerful testimony against the Best Friends gang.**

79. **At the grand jury testimony, he was again assured that nothing he said could ever be used against him in any way**.

## CHAPTER THREE: THE UNLAWFUL RENEGING ON THE AGREEMENT

80. In July of 1998, Michigan's Governor John Engler reformed the Michigan lifer law, allowing prisoners such as Plaintiff to become eligible for parole after serving 15 years in prison.

81. After the reforming of the law, Plaintiff became eligible for parole in 2002 and was in early 2003, Plaintiff was given notice by the Michigan Parole Board of his upcoming March 2003 parole hearing.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

82. Plaintiff felt that, finally, all of the life-endangering work he did for FBI agent Groman, the DEA agents, AUSA Helland, and King, while in prison was about to pay off with the Defendants keeping their end of the agreement.

83. Without Plaintiff, Operation Backbone would never have happened and the 13 corrupt Detroit Police Department officials would never have been charged.

84. Without Plaintiff, members of several Detroit's infamous drug gangs would never have been taken off the streets.

85. In preparation for his parole hearing, Plaintiff began calling the Justice Department actors that had promised to help him: starting with Assistant United States Attorney Lynn Helland, the head of the public corruption unit at the Eastern District of Michigan, to ask for him to do his end of the agreement and advocate at the hearing.

86. **Plaintiff, however, received devastating news from Helland. Namely, the deal was off and that they would not be performing their end of the agreement.**

87. **Helland informed Plaintiff that one of his superiors at the office had told him he, he nor James King could advocate for Plaintiff in the future because the United States Attorneys Office for the Eastern District of Michigan now had an official stance regarding Plaintiff: That they did not support his release (breaching their agreement with Plaintiff).**

A Y A D  L A W ,  P . L . L . C .
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

88. **The United States Attorneys Office for the Eastern District of Michigan sent a letter to that effect to the Michigan Parole Board to consider at Plaintiff's hearing.**

89. Plaintiff experienced then a worse heartbreak and suffocating sense of hopelessness than he felt when he was first convicted of life without parole.

90. Come the day of his parole hearing, Plaintiff's nightmare turned surreal as Detroit Police Officers that he had never met before testified at his hearing, quoting directly from Plaintiff's sealed grand jury testimony.

91. Plaintiff had been assured years earlier, in the mid 1990's, that his grand jury testimony would never become public and could never be used against him.

92. If he had not received that promise, Plaintiff never would have testified as he did before the grand jury, for his own safety and well-being.

93. In a bathroom break at his hearing, Plaintiff told his then attorney, Bufalino, that the Parole Board was quoting from his sealed testimony before the grand jury.

94. Bufalino's response was to tell Plaintiff not to dare make the accusation that his sealed testimony had been illegally distributed at the hearing and further to keep his mouth shut about it until after he get out of prison.

95. One of the Detroit Police Officers who Plaintiff never met before and who testified against Plaintiff was William Rice ("Rice").

96. Upon information and belief, at the time of Plaintiff's hearing, Rice was the head of, or a high-level official in, the Detroit Police Department's homicide division.

97. **In 2016, Rice signed a sworn affidavit stating that prior to Plaintiff's hearing, he had received a curated transcript of the testimony which Plaintiff gave to the grand jury and which was supposed to be sealed**.

98. Although officer Rice did not know Plaintiff he came and testified before the parole board as though he had dealt with him based on the illegally released grand jury testimony. Hence, the grand jury testimony that Plaintiff was assured would never be used against him, was used against Plaintiff to deny him parole.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

AFFIDAVIT OF WILLIAM R. RICE

STATE OF MICHIGAN        )
                         ) ss
COUNTY OF Manistee       )

I, WILLIAM R. RICE, being first duly sworn, verify and affirm that the following statements and information are made freely and voluntary:

1. My name is William R. Rice. I was a Detroit Police Officer for 35 years, prior to my retirement in 2006. For 29 years of my police career, I was assigned to the homicide section.

2. During the period of time I was in the homicide section, I was thoroughly knowledgeable with every homicide investigation that was opened or ongoing.

3. In or about 2003 I was contacted and informed that I had been selected by my superiors to testify at a parole hearing for Richard Wershe, Jr., also known as "White Boy Rick".

4. I advised the prosecution that, while I was aware of the impact that drugs were having on the community, the violence associated with the drug trade, and the difficulties involved in investigating drug related homicides, I did not know Richard Wershe, Jr. [5]

99. **Someone at the United States Attorneys Office for the Eastern District of Michigan (herein named as Defendant Unknown Assistant United States Attorney) had unlawfully published the sealed testimony to be used against Plaintiff at his hearing before the Michigan Parole Board**.

---

[5] This document has been reviewed and verified by Plaintiff.

**100.** **The significance of this leaked document is not to be taken lightly as the grand jury testimony that was presented to the Michigan Parole Board absolutely materially was the dispositive factor in the Board's decision to not allow Plaintiff parole, as it associated Plaintiff with the very dangerous Best Friends gang network.**

**101.** **This information about Plaintiff's iner dealings and knowledge of the Best Friends gang would never have been able to be known had it not been for Plaintiff's own grand jury testimony which he would have never given had he known that 1) the Defendants were going to reneg on their deal and 2) that they would go even further and use the testimony to keep him in prison for another 17 years of hell.**

102.    The results of the publishing of Plaintiff's sealed testimony were, as expected, that he was denied parole at his 2003 hearing.

103.    The psychological and emotional effects from Plaintiff's utter betrayal at the hands of Helland, Groman, King, and the Unidentified AUSA cannot be overstated.

104.    After 2003, Plaintiff fell into deep depression and despair for many years.

105.    During his depression, and desiring some emotional connection to the outside world and to his family, Plaintiff attempted to facilitate the purchase of a car for his mother from Florida while in prison.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

106.    In 2005, Plaintiff was charged with racketeering.

107.    After being kept in solitary confinement for 16 months, Plaintiff was given an ultimatum by the Florida prosecutor: Either plead guilty, or they would indict Plaintiff's mother and sister.

108.    Plaintiff chose to spare his mother and sister, and pled guilty to the trumped and ridiculous charges.

109.    The judge in the Florida case even made a note of this on the record, stating that Plaintiff had only agreed to the guilty plea because the Florida prosecutor had threatened to indict his mother and sister.

110.    Plaintiff was sentenced to five years in Florida prison, to be served after his life sentence.

111.    In approximately 2004, Plaintiff became represented by new counsel, Mr. Ralph Musilli ("Musilli") who began working diligently to get Plaintiff released from prison.

112.    **Plaintiff, having all but resigned himself to the belief that he would spend the rest of his life in prison, inquired with Musilli about potentially taking legal action against the defendants named herein, but Musilli assured Plaintiff there was a real possibility of him being released on parole and, therefore, Plaintiff did not take action against these named defendants because he truly believed they would exert their vast influence unduly to keep him in prison**.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

113.     In 2017, Plaintiff was finally paroled by the Michigan Parole Board.

114.     He never left government custody, however. Instead, Plaintiff was transferred immediately to a Florida prison, where he served five years.

115.     Plaintiff was finally released from prison on July 20, 2020.

116.     Plaintiff had spent 32 and 7 months years in prison.

117.     But-for Plaintiff's work as a confidential informant in the 1980's, Plaintiff never would have been shot.

118.     But-for Plaintiff's work as a confidential informant in the 1980's, Plaintiff never would have been sentenced to life in prison without parole.

119.     But-for Plaintiff's key role in Operation Backbone in the early 1990's, Plaintiff never would have had to have been placed in the witness protection program and lived in fear of his life while in prison.

120.     But-for Plaintiff's testimony to the grand jury in the mid-1990's, which Plaintiff was promised could never be used against him, Plaintiff never would have lost his chance at being paroled in 2003 and would not have had to do 17 additional grueling years in Prison.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

## COUNT I
### § 1983 Fifth Amendment Substantive Due Process Violation
### Unconstitutional Indoctrination of Child into Criminal Society
### (*As to Defendants Jasper and Greene*)

121.     Plaintiff and every child have a substantive due process right to be free from government grooming and indoctrination into criminality.

122.     This right is clear from the history of our culture and was or should have been obvious to the law enforcement officers that taught Plaintiff to deal drugs.

123.     Defendants taught Plaintiff how to deal drugs and encouraged him, with the undue influence of adult authority figures over children, in this behavior and as a direct result, Plaintiff became a drug dealer.

124.     The upholding of the right of children to be free from government grooming or indoctrination must be upheld if the United States of America is to have a free and ordered society.

125.     Defendants' actions in continuously taking 14-16-year-old Plaintiff into their custody and control, couching him on how to commit serious felonies, providing him with large amounts of illicit drugs, and instructing him on how to behave like a high-level criminal, absolutely shocks the conscience to the point were several documentaries and a Hollywood film have been made recounting the almost unbelievable sequence of governmental abuses.

126.     But-for Defendants' actions in grooming and indoctrinating Plaintiff into becoming a notorious drug dealer, Plaintiff would never have been shot in the abdomen at point blank range with a .357 magnum.

127.     But-for Defendants' actions in grooming and indoctrinating Plaintiff as a child, Plaintiff never would have spent his entire adult life (32 years and 7 months) up until now in the small, dark, cages that were his prison cells.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

128.     As a direct result of Defendants' above-described unlawful acts, Plaintiff suffered 32 and 7 months years in prison. Plaintiff still suffers residual physical and psychological injuries as a direct result of Defendants above-described actions including but not limited to: severe anxiety, severe depression, severe paranoia, severe digestive issues, and incurable abdominal pains.

WHEREFORE, as Plaintiff's injuries are a direct result of Defendants' clear violation of his obvious constitutional rights, justice demands that this Honorable Court grant Plaintiff's requested relief.

### COUNT II
### § 1983 *Monell* Liability
### Substantive Due Process Violation
### (*As to Defendant City of Detroit*)

129.     Detroit Police Department Defendants William Jasper and Kevin Greene acted in the above-described manners, in violation of Plaintiff's above-described constitutional rights, pursuant to official and/or unofficial Detroit Police Department policy.

130.     The City of Detroit was the moving force behind Plaintiff's injuries in that it sanctioned, officially and unofficially, the abuse of Plaintiff by his use as a child informant and drug dealer and the use of his sealed grand jury testimony against him at his parole hearing.

131.    Defendant The City of Detroit, through its deliberate conduct, had a "policy or custom" that caused the above-described violation of Plaintiff's rights.

132.    The indoctrination of Plaintiff as a 14-year-old child into a drug dealer was the direct result of the City of Detroit's official policy regarding its joint task force with the FBI and the extreme war on drugs.

133.    Additionally or alternatively, the indoctrination of Plaintiff as a 14-year-old child into a drug dealer was the direct result of a final decision maker at the City of Detroit ratifying it.

134.    Additionally or alternatively, the indoctrination of Plaintiff as a 14-year-old child into a drug dealer was the direct result of the City of Detroit's inadequate training as to the use of children in repeated, continued, and dangerous operations where they were entrusted with the custody of large amounts of illicit drugs.

135.    Additionally or alternatively, the indoctrination of Plaintiff as a 14-year-old child into a drug dealer was the direct result of the City of Detroit's custom of indifference and tolerance to federal constitutional rights violations.

136.    As a direct result of Defendants' above-described unlawful acts, Plaintiff suffered 32 and 7 months years in prison. Plaintiff still suffers residual physical and psychological injuries as a direct result of Defendants above-described actions including but not limited to: severe anxiety, severe

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

depression, severe paranoia, severe digestive issues, and incurable abdominal pains.

WHEREFORE, as Plaintiff's injuries are a direct result of Defendants' clear violation of his obvious constitutional rights, justice demands that this Honorable Court grant Plaintiff's requested relief.

### COUNT III
### § 1983 *Monell* Liability
### Procedural Due Process Violation
### (*As to Defendant City of Detroit*)

137.     Detroit Police Department Defendants William Jasper and Kevin Greene acted in the above-described manners, in violation of Plaintiff's above-described constitutional rights, pursuant to official and/or unofficial Detroit Police Department policy.

138.     The City of Detroit was the moving force behind Plaintiff's injuries in that it sanctioned, officially and unofficially, the abuse of Plaintiff by his use as a child informant and drug dealer and the use of his sealed grand jury testimony against him at his parole hearing.

139.     Defendant The City of Detroit, through its deliberate conduct, had a "policy or custom" that caused the above-described violation of Plaintiff's rights.

140.     Official policy 2 – The acquiring of Plaintiff's sealed grand jury testimony and its distribution to Detroit Police Officers, including William

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

Rice, who were then instructed to go testify against Plaintiff as if from their personal knowledge was the result of an official policy of the City of Detroit.

141.     Additionally or alternatively, the acquiring of Plaintiff's sealed grand jury testimony and its distribution to Detroit Police Officers, including William Rice, who were then instructed to go testify against Plaintiff as if from their personal knowledge was the result of the ratification of a final decision maker at the City of Detroit and/or its Detroit Police Department, as William Rice was a high-ranking Detroit Police Department official at the time (head of the homicide unit) and he testified that he was commanded to review the sealed grand jury testimony and testify at Plaintiff's 2003 parole hearing.

142.     Additionally or alternatively, the acquiring of Plaintiff's sealed grand jury testimony and its distribution to Detroit Police Officers, including William Rice, who were then instructed to go testify against Plaintiff as if from their personal knowledge was the result of the City of Detroit's custom or policy of inadequate training as to the unlawfulness of using sealed testimony in said fashion and testifying so as to make it appear that the officer had first-hand knowledge of the events they described.

143.     Additionally or alternatively, the acquiring of Plaintiff's sealed grand jury testimony and its distribution to Detroit Police Officers, including William Rice, who were then instructed to go testify against Plaintiff as if

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

from their personal knowledge was the direct result of a policy or custom of indifference and tolerance of constitutional violations by the City of Detroit employees and their police.

144.     As a direct result of Defendant the City of Detroit's above-described illegal policy or custom, Plaintiff suffered severe injury as a direct result of Defendants' above-described actions in the form of doing another 17 years in prison, in having his parole denied, in having his hope and faith in humanity shattered.

WHEREFORE, as Plaintiff's injuries are a direct result of Defendants' clear violation of his obvious constitutional rights, justice demands that this Honorable Court grant Plaintiff's requested relief.

**COUNT IV**
**§ 1983 Fourth Amendment Illegal Seizure Violation**
**Taking Plaintiff into Custody Throughout Childhood**
(*As to Defendants Jasper and Greene*)

145.     Plaintiff has a Fourth Amendment right, applicable to the States via the Fourteenth Amendment, to be free from unlawful government seizures of his person.

146.     Defendants violated said right, continuously, when they unlawfully seized Plaintiff time and again in 1984 through 1986, through a show of force and authority at Plaintiff, ordering him to get into their vehicles, go into drug houses, etc.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

147.     Plaintiff, a child, submitted to all of the above-described shows of force and authority.

148.     The injuries from the above-described violations of Plaintiff's Fourth Amendment right to be free from unlawful government seizure eventually led to his indoctrination as a drug dealing criminal and his serving 32 years and 7 months in prison. Plaintiff still suffers residual physical and psychological injuries as a direct result of Defendants above-described actions including but not limited to: severe anxiety, severe depression, severe paranoia, severe digestive issues, and incurable abdominal pains.

WHEREFORE, as Plaintiff's injuries are a direct result of Defendants' clear violation of his obvious constitutional rights, justice demands that this Honorable Court grant Plaintiff's requested relief.

### COUNT V
### § 1983 Conspiracy to Violate First Amendment
### Right to Family Integrity
### (*As to Defendants Jasper and Greene*)

149.     Plaintiff had a First Amendment right to family integrity as a minor child in the 1980's.

150.     Defendants Jasper and Greene deprived Plaintiff of that right by indoctrinating and grooming him into a criminal drug dealer and then failing to take any action to mitigate his separation from his family as a direct and obvious result of their actions.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

151.     The Defendants had a single purpose in conspiring to violate Plaintiff's right to be with his family by having his 1) become a drug dealer and/or 2) be sent to prison.

152.     Defendants each participated in bringing about the constitutional violation by indoctrinating, grooming, or otherwise making Plaintiff into a drug dealing criminal. Defendants Jasper and Greene both forced Plaintiff to buy and sell drugs, to associate with gangsters, and condoned his keeping of drugs and eventual drug dealing.

153.     As the indoctrination and grooming of Plaintiff to become a drug dealer at such a young, tender, age did itself rob Plaintiff of his family integrity, it also failed to afford Plaintiff adequate due process of law, as is required before government interference with one's First Amendment right to familial integrity.

154.     As a direct result of Defendants actions, Plaintiff spent 32 years and 7 months away from his family, was not allowed to say goodbye to his father or attend his funeral, was not allowed to raise his children, and even became a grandfather while in prison. Now that he is out, Plaintiff is practically a stranger to those closest to him.

WHEREFORE, as Plaintiff's injuries are a direct result of Defendants' clear violation of his obvious constitutional rights, justice demands that this Honorable Court grant Plaintiff's requested relief.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

## COUNT VI
### *Bivens* Fifth Amendment Substantive Due Process Violation
### Unconstitutional Indoctrination of Child into Criminal Society
### (*As to Defendants Dixon and Groman*)

155.    Plaintiff and every child have a substantive due process right to be free from government grooming and indoctrination into criminality.

156.    This right is clear from the history of our culture and was or should have been obvious to the law enforcement officers that taught Plaintiff to deal drugs.

157.    Defendants taught Plaintiff how to deal drugs and encouraged him, with the undue influence of adult authority figures over children, in this behavior and as a direct result, Plaintiff became a drug dealer.

158.    The upholding of the right of children to be free from government grooming or indoctrination must be upheld if the United States of America is to have a free and ordered society.

159.    Defendants' actions in continuously taking 14-16-year-old Plaintiff into their custody and control, couching him on how to commit serious felonies, providing him with large amounts of illicit drugs, and instructing him on how to behave like a high-level criminal, absolutely shocks the conscience to the point were several documentaries and a Hollywood film have been made recounting the almost unbelievable sequence of governmental abuses.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

160.     But-for Defendants' actions in grooming and indoctrinating Plaintiff into becoming a notorious drug dealer, Plaintiff would never have been shot in the abdomen at point blank range with a .357 magnum.

161.     But-for Defendants' actions in grooming and indoctrinating Plaintiff as a child, Plaintiff never would have spent his entire adult life (32 years and 7 months) up until now in the small, dark, cages that were his prison cells.

162.     As a direct result of Defendants' above-described unlawful acts, Plaintiff suffered 32 and 7 months years in prison. Plaintiff still suffers residual physical and psychological injuries as a direct result of Defendants above-described actions including but not limited to: severe anxiety, severe depression, severe paranoia, severe digestive issues, and incurable abdominal pains.

WHEREFORE, as Plaintiff's injuries are a direct result of Defendants' clear violation of his obvious constitutional rights, justice demands that this Honorable Court grant Plaintiff's requested relief.

### COUNT VII
*Bivens* **Fifth Amendment Due Process Violation**
**Breaching Promise of Immunity**
(***As to Defendants Groman, Helland, and King***)

163.     Plaintiff has a clearly established Fifth Amendment right, applicable to the States via the Fourteenth Amendment, to the government's keeping its relied-on promises in all criminal judicial proceedings against Plaintiff.

164.     In exchange for Plaintiff's life-endangering assistance in Operation Backbone, Defendants agreed to advocate for Plaintiff's release from prison at a meaningful time and in a meaningful way.

165.     Plaintiff acted in reliance on the Defendants' promise that they would vehemently advocate for his release, at a meaningful time and in a meaningful way, when he cooperated against his former close friend Cathy Valos and many Detroit Police Department officials in Operation Backbone.

166.     Defendants breached their agreement with Plaintiff, in violation of his due process rights, when in 2003 at his first parole hearing Defendants refused to advocate for Plaintiff's release and, in fact, advocated for his permanent incarceration.

167.     Plaintiff suffered severe injury as a direct result of Defendants' above-described actions in the form of doing another 17 years in prison, in having his parole denied, in having his hope and faith in humanity shattered.

168.     Plaintiff's injury was suffered anew every day for the entire remainder of his time in prison as he was burdened with the residual paranoia that comes with having been an informant against members of gangs with prison presences and corrupt police officers which require one to be put into a witness protection program while in prison.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

WHEREFORE, as Plaintiff's injuries are a direct result of Defendants' clear violation of his obvious constitutional rights, justice demands that this Honorable Court grant Plaintiff's requested relief.

**COUNT VIII**
***Bivens* Fifth Amendment Due Process Violation**
**Publication of Sealed Grand Jury Testimony**
(***As to Defendants Unknown Assistant United States Attorney***)

169.    Plaintiff has a clearly established Fifth Amendment right, applicable to the States via the Fourteenth Amendment, to the government's keeping its relied-on promises in all criminal judicial proceedings against Plaintiff.

170.    In exchange for Plaintiff's life-endangering assistance in giving sealed grand jury testimony against high-ranking members of powerful drug gangs, Defendants agreed both that Plaintiff's testimony would never be used against him and to advocate for Plaintiff's release from prison at a meaningful time and in a meaningful way.

171.    Plaintiff acted in reliance on the Defendants' promise that his testimony before the grand jury would never be published or used against him and that they would vehemently advocate for his release, at a meaningful time and in a meaningful way, when he cooperated and testified against powerful gang members in gangs that had large presences in his prison.

172.    Defendants breached their agreement with Plaintiff when they refused to advocate for his release in 2003 at his first parole hearing, submitted a letter

advocating for his continued life sentence, and published part or all of Plaintiff's testimony before a grand jury that was sealed and elicited from Plaintiff with the promise by Defendants that it would never be used in any such way.

173.     Plaintiff suffered severe injury as a direct result of Defendants' above-described actions in the form of doing another 17 years in prison, in having his parole denied, in having his hope and faith in humanity shattered.

WHEREFORE, as Plaintiff's injuries are a direct result of Defendants' clear violation of his obvious constitutional rights, justice demands that this Honorable Court grant Plaintiff's requested relief.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

## COUNT IX
### *Bivens* Conspiracy to Violate Fifth Amendment Due Process Rights
### Breaching of Promise / Publication of Sealed Grand Jury Testimony
### (*As to Defendants Helland, King, and Unknown Assistant United States Attorney*)

174.     As stated above, Plaintiff had a clearly established Fifth Amendment right, applicable to the States via the Fourteenth Amendment, to the government's keeping its relied-on promises in all criminal judicial proceedings against Plaintiff.

175.     This right included the right to the Defendants' keeping the promise which Plaintiff relied on to not have his sealed testimony published to the

Michigan Parole Board and Detroit Police Department for consideration at Plaintiff's parole hearings.

176.     Additionally, Plaintiff has a fifth amendment procedural due process right to not have his sealed testimony published for consideration by the Michigan Parole Board, regardless of his reliance and/or promises not to publish it.

177.     Defendants had a singular plan to violate Plaintiff's above-described constitutional right by publishing his sealed grand jury testimony to his parole board.

178.     Defendants acted in concert to elicit the grand jury testimony from Plaintiff and then publish it.

179.     On Plaintiff's 2003 phone call with Defendant AUSA Lynn Helland, Helland told Plaintiff expressly that his "boss," named in this matter as Unknown Assistant United States Attorney, had obtained the sealed grand jury testimony.

180.     Defendants acted in concert when the grand jury testimony was acquired by the Detroit Police Department for review by its officers to enable them to testify against Plaintiff at his 2003 parole hearing.

181.     Defendants violated Plaintiff's said due process right when they published part or all of Plaintiff's testimony before a grand jury that was sealed

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

and elicited from Plaintiff with the promise by Defendants that it would never be used in any such way.

182.     Plaintiff suffered severe injury as a direct result of Defendants' above-described actions in the form of doing another 17 years in prison, in having his parole denied, in having his hope and faith in humanity shattered.

WHEREFORE, as Plaintiff's injuries are a direct result of Defendants' clear violation of his obvious constitutional rights, justice demands that this Honorable Court grant Plaintiff's requested relief.

### COUNT X
***Bivens* Fourth Amendment Illegal Seizure Violation**
**Taking Plaintiff into Custody Throughout Childhood**
(***As to Defendants Dixon and Groman***)

183.     Plaintiff has a Fourth Amendment right, applicable to the States via the Fourteenth Amendment, to be free from unlawful government seizures of his person.

184.     Defendants violated said right, continuously, when they unlawfully seized Plaintiff time and again in 1984 through 1986, through a show of force and authority at Plaintiff, ordering him to get into their vehicles, go into drug houses, etc.

185.     Plaintiff, a child, submitted to all of the above-described shows of force and authority.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

186.     The injuries from the above-described violations of Plaintiff's Fourth Amendment right to be free from unlawful government seizure eventually led to his indoctrination as a drug dealing criminal and his serving 32 years and 7 months in prison. Plaintiff still suffers residual physical and psychological injuries as a direct result of Defendants above-described actions including but not limited to: severe anxiety, severe depression, severe paranoia, severe digestive issues, and incurable abdominal pains.

WHEREFORE, as Plaintiff's injuries are a direct result of Defendants' clear violation of his obvious constitutional rights, justice demands that this Honorable Court grant Plaintiff's requested relief.

**COUNT XI**
***Bivens* Conspiracy to Violate First Amendment**
**Right to Family Integrity**
**(*As to Defendants Dixon and Groman*)**

187.     Plaintiff had a First Amendment right to family integrity as a minor child in the 1980's.

188.     Defendants Dixon and Groman deprived Plaintiff of that right by indoctrinating and grooming him into a criminal drug dealer and then failing to take any action to mitigate his separation from his family as a direct and obvious result of their actions.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

189.     The Defendants had a single purpose in conspiring to violate Plaintiff's right to be with his family by having his 1) become a drug dealer and/or 2) be sent to prison.

190.     Defendants each participated in bringing about the constitutional violation by indoctrinating, grooming, or otherwise making Plaintiff into a drug dealing criminal. Defendants Dixon and Groman both forced Plaintiff to buy and sell drugs, to associate with gangsters, and condoned his keeping of drugs and eventual drug dealing.

191.     As the indoctrination and grooming of Plaintiff to become a drug dealer at such a young, tender, age did itself rob Plaintiff of his family integrity, it also failed to afford Plaintiff adequate due process of law, as is required before government interference with one's First Amendment right to familial integrity.

192.     As a direct result of Defendants actions, Plaintiff spent 32 and 7 months years away from his family, was not allowed to say goodbye to his father or attend his funeral, was not allowed to raise his children, and even became a grandfather while in prison. Now that he is out, Plaintiff is practically a stranger to those closest to him.

WHEREFORE, as Plaintiff's injuries are a direct result of Defendants' clear violation of his obvious constitutional rights, justice demands that this Honorable Court grant Plaintiff's requested relief.

## CONCLUSION AND RELIEF REQUESTED

Practitioners of law often fall into the mindset that for every legal question, there is either an answer to be found in our courts' jurisprudence or, at least, caselaw from which analogies can be made. However, sometimes the clearest answer is not the legal answer, but the equitable one. What these defendants helped do to Plaintiff is atrocious. There is no other case like Plaintiff's in United States history where a 14-year-old is used by federal and state law enforcement, shot and almost killed for his confidential informing, and then not just abandoned by the law enforcement he served but actively and unconstitutionally betrayed by them. Criminals have been wrongly convicted, minors have been given life sentences, but never has a child-confidential informant been so abused by law enforcement as these agents and officers abused Plaintiff. As one former FBI agent finally had the courage to admit in a 2012 letter to the Michigan Parole Board, no law enforcement agency lifted a

finger when Plaintiff was tried, out of a fear of 'embarrassment' for having so abused
a child.

**Page 1 of 4**

Gregory H. Schwarz

June 19, 2012



Michigan Parole Board
State of Michigan
Department of Corrections
Grandview Plaza Building
PO Box 30003
Lansing, MI 48909

RECEIVED
MI DEPT of CORRECTIONS

JUN 2 2 2012

Parole Board

192034

Dear Parole Board Members,

Twenty five years have now passed on a sentence for Richard Wershe, Jr. As you know
this case was for the crime of Possession of Controlled Substance of more than 650
grams. On 01/15/88 he received a life sentence. In federal court those with the same
offense received only three years and yet Richard got life without parole. Richard was 17
years of age at the time. He is now 43years old and a man who regrets the actions of his
youthful decisions. If I recall there were judges whom stated they disagreed with the law
as it was far too stringent. I write this letter to you on behalf of numerous former agents
of the federal government, former Police officers who had direct dealings with Richard
and concerned citizens who have learned of his confinement and no apparent future with
the parole board.

A compelling factor was that Richard was being used by the federal government and
various police agencies as an operative or source. I know you were advised of this
information at the time of his other hearings. During the various investigations he was
directed to operate in the drug community and provide information to law enforcement.
He performed these duties under the promise that he would receive consideration should
he become involved himself. He did but as we know, no department or agency came to
his rescue. At the time, his age was a factor and would have been an embarrassment to
the federal government. As stated, several agencies promised intervention but it never
occurred. Richard continued to cooperate.

After confinement, Richard was asked about the murder of a small boy, Damion Lucas
by a particular gang. He provided information on that homicide as to the identity of the
shooters which was covered up by the Detroit Police Department. I spoke to Michael Cox
of Wayne County who, in front of me, stated that his cooperation would be of great help
to the State. He provided the exact information the state needed and the state did nothing.
On another matter, AUSA James King, in the presence of FBI Agents said he would get
Wershe relief after he provided information on Best Friends which was a joint task force
investigation. That consideration never occurred. Again USA Lynn Helland stated the
office would help him if he provided information on the case involving Jimmy Harris,
former Detroit Police officer. While Richard kept his end of the bargain and, provided
most of the information, the federal government backed away.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

6

Indeed, this is a unique case. Plaintiff is the youngest FBI informant in this history of this nation, known to this Plaintiff. Plaintiff also holds the record as the longest serving prisoner convicted as a juvenile on a nonhomicide offense in the State of Michigan. Our Constitution, our justice system, and God-given right to all humanity calls on this Court to finally bring justice to a man whose life has been taken from him at the tender age of 14 all the way up to 51 years of age. For conduct that was not of his free will, but that of a minor who has been used, abused, reused, and re-abused by those that have sworn to protect and serve this country.

Plaintiff's story has been told in multiple film documentaries and a Hollywood movie. Many people know Plaintiff's story in detail, and virtually all who do feel Plaintiff was unfairly and despicably abused by law enforcement.

WHEREFORE, Plaintiff requests that this Honorable Court enter judgement in his favor against all Defendants, jointly and severally, and issue an order containing the following relief:

    a) Declaring that Defendants the City of Detroit, Dixon, Groman, Jasper, and Greene violated Plaintiff's Fifth Amendment rights when they indoctrinated him into becoming a drug dealer;

---

6 This document has been reviewed and verified by Plaintiff.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

b) Declaring that Defendants the City of Detroit, Helland and King violated Plaintiff's Fifth Amendment due process rights when they broke their promises to him to advocate on his behalf at his trial and before the Michigan Parole Board;

c) Declaring that Defendants Helland, King, and Unknown Assistant United States Attorney violated Plaintiff's Fifth Amendment due process rights when they conspired to publish his sealed grand jury testimony;

d) Declaring that Defendants Dixon, Groman, Jasper, and Greene violated Plaintiff's Fourth Amendment due process right to be free from unlawful arrests, which was then ratified by the City of Detroit, when they continuously used their authority to stop Plaintiff and force him into their vehicles to answer questions or receive drugs for drug dealing;

e) Declaring that all Defendants violated Plaintiff's First Amendment right to family integrity;

f) Ordering Defendants to pay Plaintiff $100,000,000 for their intentional violations of his constitutional rights;

g) Ordering Defendants to pay Plaintiff's costs and attorney fees under the equal access to justice act; and

h) Any and all such other relief that this Court deems just and equitable including any tolling of limitations periods necessary to accomplish justice.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

## DEMAND FOR TRIAL BY JURY

Plaintiff respectfully demands a trial-by-jury of his peers on all of the foregoing claims.

## VERIFICATION

I have read the attached verified complaint and to the best of my knowledge, recollection, and belief, its contents are true, accurate, and correct.

Executed on: _____

Signed: _____
                        Plaintiff

Respectfully submitted;

AYAD LAW, PLLC

*/s/Nabih H. Ayad*
Nabih H. Ayad (P59518)
William D. Savage (P82146)
*Attorneys for Plaintiff*
645 Griswold St., Ste 2202
Detroit, MI 48226
P: 313.983.4600
F: 313.983.4665
Dated: September 14, 2021      ayadlaw@hotmail.com

## DEMAND FOR TRIAL BY JURY

Plaintiff respectfully demands a trial-by-jury of his peers on all of the foregoing claims.

## VERIFICATION

I have read the attached verified complaint and to the best of my knowledge, recollection, and belief, its contents are true, accurate, and correct.

Executed on: _10 - 10 - 21_

Signed: _Richard S. Wieske Jr._

      Plaintiff

Respectfully submitted;

AYAD LAW, PLLC

_/s/Nabih H. Ayad_
Nabih H. Ayad (P59518)
William D. Savage (P82146)
_Attorneys for Plaintiff_
645 Griswold St., Ste 2202
Detroit, MI 48226
P: 313.983.4600
F: 313.983.4665
ayadlaw@hotmail.com

Dated: September 10, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on this date I filed the foregoing paper and any attachments with the Clerk of Courts using the ECF electronic filing system.

Respectfully submitted;

AYAD LAW, PLLC

*/s/Nabih H. Ayad*
Nabih H. Ayad (P59518)
William D. Savage (P82146)
*Attorneys for Plaintiff*
645 Griswold St., Ste 2202
Detroit, MI 48226
P: 313.983.4600
F: 313.983.4665
Dated: September 14, 2021          ayadlaw@hotmail.com